**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RASHUN SINGLETON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 17 C 4514** |
| | ) | |
| **v.** | ) | **Judge Robert W. Gettleman** |
| | ) | |
| **AMITA HEALTH,** *et al.*, | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendants.** | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff worked as a Certified Medical Assistant for Defendant Amita Health from October 2015 until her termination in January 2017, providing clerical and clinical services to various physician practices. (Doc. 1; Doc. 99, at 5). She filed EEOC charges on March 30, October 7, and December 9, 2016, and then filed this lawsuit on June 15, 2017, alleging employment discrimination based on race and sex in violation of Title VII of the Civil Rights Act of 1964. (Doc. 1). As explained in this Court's August 16, 2018 Order (Doc. 115), the case was then referred to this Court for supervision of discovery and a settlement conference (Doc. 20), and the parties eventually participated in a settlement conference lasting just under three hours on April 16, 2018. (Doc. 53; Doc. 82-2). Immediately afterward, the parties' counsel summarized the terms of a (now disputed) settlement agreement, and the parties themselves expressed their understanding and acceptance of those terms, all on the record. (Doc. 82-2).

Now pending is Defendant's combined Motion to Enforce the terms of that oral settlement agreement, and for sanctions in the form of Attorney's Fees or Dismissal with Prejudice. (Doc. 82). Plaintiff opposes the motion, asserting that her agreement to the settlement terms was neither knowing nor voluntary, and was instead the product of

undue influence and duress. (Docs. 102 and 107). The District Judge (Judge Gettleman) referred the motion to this Court for a report and recommendation. (Doc. 116). Having reviewed the parties' respective submissions, this Court recommends that the District Judge grant Defendant's motion to enforce the oral settlement agreement stated on the record on April 16, 2018, as set out below, and dismiss this action with prejudice, but deny Defendant's further request for sanctions and attorney's fees.

## BACKGROUND

I.    **The Settlement Conference and Court Hearing**

Although the parties expressed interest in a settlement conference in their initial status report on October 24, 2017, and the case was referred to this Court to oversee such a conference on November 1, 2017, it was not until April 2018 that the conference was finally held. (Docs. 19-20, 56). This delay of several months was due primarily to the withdrawal of Plaintiff's volunteer settlement counsel in January 2018, citing a "difference of opinion regarding strategy for the settlement proceedings." (Doc. 44).[1] The next two months were then consumed by Plaintiff's efforts to retain new counsel. (Docs. 47-50). Once Plaintiff did so in late February 2018, the parties rescheduled their settlement conference for April 16, 2018, and proceeded with the required exchange of written settlement positions. (Docs. 52-53).

The conference began at approximately 1:30 p.m. on April 16, and over the nearly three hours that followed, this Court had multiple caucus sessions with each side separately in an effort to facilitate the negotiations. During these caucus sessions, the

---

[1]    Plaintiff obtained this volunteer attorney through the Settlement Assistance Program solely for the limited purpose of assisting Plaintiff in connection with settlement proceedings in this case. (Doc. 27).

Court spent considerable time with Plaintiff and her two attorneys and observed Plaintiff's active participation. By 4:13 p.m. the parties had reached an agreement to settle the case and appeared in the courtroom for a hearing before this Court to recite the agreed-upon terms on the record. (Doc. 82-2). As is this Court's practice, the Court informed both sides at the outset of that hearing that their lawyers would be required to recite each of the settlement terms on the record and then the parties themselves would be required to state their understanding of and agreement to those terms, also on the record. (*Id.* at 2). The Court then instructed Defendant's counsel to begin the presentation, and Plaintiff's counsel to add or clarify any of the terms stated by Defendant's counsel, if needed. (*Id.*). When the lawyers finished that presentation and agreed that all monetary and non-monetary settlement terms had been recited accurately (*id.* at 2-9), the Court asked the parties themselves to step up and confirm their understanding of and agreement to those terms. (*Id.* at 9-12).

The Court began with the representative appearing on behalf of Defendant Amita Health, Mr. Jason Burris. The Court asked Mr. Burris (1) if he had authority to settle the case on behalf of Amita, (2) if he heard the settlement terms recited by the lawyers, (3) if those terms were an accurate summary of what he had agreed to settle the case, and (4) if he understood that, although no settlement documents had been signed, his agreement to those terms was binding and could not be retracted when he left the courtroom. (*Id.* at 9-10). Mr. Burris responded affirmatively to each question. (*Id.*). The Court then asked Plaintiff to step forward, and the following exchange occurred:

> THE COURT:  All right.  Did you hear the summary of all the settlement terms?
>
> THE PLAINTIFF: Yes.

THE COURT: And did you have a chance to discuss those settlement terms with your attorneys?

THE PLAINTIFF: Yes.

THE COURT: Was the summary of the settlement terms an accurate summary of what you've agreed to settle your case?

THE PLAINTIFF: Yes.

THE COURT: And do you understand even though you haven't signed the settlement documents yet that the lawyers will draft and send to you, this is a binding settlement agreement so you can't change your mind on the settlement terms when you leave the courtroom? Do you understand?

THE PLAINTIFF: Yes.

(Doc. 82-2, at 10-11).

The Court then thanked Plaintiff for her answers, at which point she responded with a question of her own, and the hearing continued as follows:

THE PLAINTIFF: And I also wanted to ask about the tax part of it.

THE COURT: All right. Well, why don't you ask your attorney first because you're on the record.

THE PLAINTIFF: All right.

THE COURT: Then if you need to come back on the record, we can.

THE PLAINTIFF: All right. Thank you.

(Doc. 82-2, at 11). After a brief recess while Plaintiff conferred with her attorney, the hearing concluded with the following:

THE COURT: All right. Let me ask you, Ms. Singleton. Now that you talked to your attorney, did you still want to ask me a question?

THE PLAINTIFF: No.

THE COURT: Okay, you've indicated not. All right. Then is there anything else that we need to put on the record at this point?

> MS WALKUP [DEFENSE COUNSEL]: No, Your Honor. You'll advise Judge Gettleman of the settlement, or should we call his clerk?
>
> THE COURT: I'm going to send him an e-mail right now.
>
> MS WALKUP: Okay. Great.
>
> THE COURT: We can go off the record.

(Doc. 82-2, at 11-12).

## II.   The Settlement Terms

Defendant's motion seeks to enforce 15 settlement terms recited during the April 16 hearing, which Defendant has divided into two categories – 4 monetary terms and 11 non-monetary terms. Regarding the monetary terms, Defendant first asserts that it is required to pay a specified amount to settle the case; and second, that 60% of this amount is to be distributed to Plaintiff, and 40% is to be distributed in payment of her attorney's fees. (Doc. 82, at 4). Third, of the sum to be paid to Plaintiff, a form 1099 is to be issued to Plaintiff for 50% of that amount, and the remaining amount would be subject to wage withholding for which a W-2 would be issued to Plaintiff. (*Id.*). And fourth, once the amounts paid to Plaintiff and for her attorney's fees are tendered, the Defendant will have satisfied its monetary obligations under the agreement, and the settlement would not be contingent on an agreement being reached by Plaintiff and her then current and former counsel regarding how to divide the attorney's fees among counsel. (*Id.*). The settlement hearing transcript confirms each of these agreed terms. (Doc. 82-2, at 2-3, 7).

The 11 non-monetary terms that Defendant seeks to enforce are similarly reflected in the hearing transcript. (*Id.* at 4-8). First, the instant lawsuit (Case No. 17-cv-4514) is to be dismissed, such dismissal being a precondition to Defendant's payment of the foregoing settlement amount. (*Id.* at 5-8). Second, Defendant will make no admission of

liability. (*Id.* at 5). Third, Plaintiff agreed that Defendant will not rehire Plaintiff, and she cannot reapply for employment with Defendant. (*Id.* at 4-5). Fourth, Plaintiff released all claims. (*Id.* at 5). Fifth, this release is subject to a "carve-out" for a specific worker's compensation claim relating to an injury Plaintiff allegedly suffered on November 2, 2016, which Plaintiff had not filed as of the April 16 settlement conference. (*Id.* at 4).[2] The parties also specified that this carve-out is limited to the worker's compensation claim for that alleged injury, and explicitly acknowledged that any claims for retaliatory discharge or wrongful termination therefore are not carved out and are instead included in Plaintiff's release. (*Id.*). Sixth, Plaintiff agreed to withdraw all administrative charges arising out of her employment with Defendant pending in the Illinois Department of Human Rights ("IDHR"), as well as any other administrative charges arising out of her employment with Defendant, not to revoke such withdrawals, and to tender to Defendant file-stamped copies of such withdrawals. (*Id.* at 5-6). Seventh, in the event Plaintiff files a suit for a claim that she released (and assuming Defendant has by then provided consideration for the release), Plaintiff will indemnify Defendant for that action. (*Id.* at 4). Eighth, the parties agreed that the settlement terms would be kept confidential, except that Plaintiff would be allowed to "discuss the terms of the settlement with her attorney, her tax advisors, of course, the IRS, and as otherwise required by law." (*Id.* at 3, 9).[3] Tenth, the parties also

---

[2]    According to a "Motion to Add Lawsuits to Amended Charges" filed by Plaintiff on January 8, 2018, she reportedly injured both of her feet while at work on November 2, 2016, and Plaintiff filed for review of that case on November 20, 2017. (Doc. 38, at 2). The same motion further explains that Plaintiff was at one time represented by a separate attorney on her workers' compensation claim, but the attorney withdrew "without rhyme or reason" on October 31, 2017, and "is the 3rd attorney to withdraw from [her] combined cases under similar circumstances." (*Id.*).

[3]    Defense counsel said she and Mr. Dvorak had agreed to confidentiality language and she would exchange the language with him before finalizing it. (*Id.* at 3). Since the parties never signed a subsequent written agreement, Defendant is seeking only to enforce the confidentiality terms stated on the record during the April 16 hearing. This is also true with regard to the covenant

agreed to a specific amount of "liquidated damages" if Plaintiff "breaches the confidentiality provisions of the settlement agreement." (*Id.*). And lastly, for the eleventh non-monetary term (the only one that the Court recommends *not* be enforced), the record reflects merely the statement (by defense counsel) "and I believe non-disparagement" but no further elaboration. (*Id.* at 5).

### III.    Post-Settlement Disputes and Motion Practice

As discussed in this Court's August 16, 2018 Order (Doc. 115), immediately after the April 16 settlement conference hearing, the parties filed a joint Consent to Exercise of Jurisdiction by a Magistrate Judge (*i.e.*, this Court), in keeping with their intention stated during the hearing to present to this Court any issues relating to an attorney lien asserted by an attorney previously retained by Plaintiff. (Doc. 57; Doc. 82-2, at 6-8). Additionally, although the parties expressly agreed during the hearing that their oral on-the-record settlement was binding without a written agreement, in keeping with their stated intention to prepare one, the Court entered an Order directing the parties "to promptly prepare and exchange settlement documents." (Doc. 56). But despite these events, email correspondence between Plaintiff and her attorneys that Plaintiff has since filed in the public record demonstrates that within days of the settlement hearing, Plaintiff began expressing unhappiness with the settlement agreement she had entered into and confirmed on the record on April 16.[4]

---

not to sue with indemnification. (*Id.* at 4).

[4]    The Court advised Plaintiff during a hearing on July 26, 2018, that she was not required to reveal any communications with her lawyers when opposing enforcement of the settlement agreement, and if she did so, that could waive her privilege regarding those and potentially other communications. Within five days of this caution, Plaintiff's pro se response to the instant motion attached numerous emails between herself and the attorneys who represented her at the settlement conference, the content of which is discussed throughout her responses. (Docs. 102 and 107). Both the emails and the body of Plaintiff's responses accuse Plaintiff's  counsel of

First, in an April 18, 2018 email to her attorney, Plaintiff stated "I don't want to settle the case, and be negatively impacted with my ongoing workers comp case." (Doc. 107, at 46). A week later, on April 25, Plaintiff complained that her worker's compensation case was being "compromised" by settling her "disability charge," which Plaintiff claimed "is the strongest part of that case," and that her lawyer had "promised" that her worker's compensation claim "would not be affected" by the settlement. (*Id.* at 48). Plaintiff also complained that she was "disappointed with the outcome of [her] case" because she "did not agree to several things," including the "settlement amount." (*Id.*). Plaintiff also asked why future court appearances had been stricken, complained that no one informed her that the case would be reassigned from Judge Gettleman, and asked that the case be reassigned back to him. (*Id.*). Plaintiff's counsel responded to these inquiries by reminding Plaintiff that she agreed as part of the settlement to set aside her IDHR claims, and that she finalized the settlement terms on the record before this Court. (*Id.*).

Shortly afterward, on May 7, 2018, pursuant to the Court's April 16 Order, Defendant's counsel tendered a proposed written settlement agreement to Plaintiff's counsel. (Doc. 82, at 2). But Plaintiff did not sign it. Instead, she filed a motion to vacate the parties' Consent to proceed before a magistrate judge, asking that the case be reassigned to Judge Gettleman. (Docs. 60-61). During the May 17 hearing on that motion (which the Court denied without prejudice to reasserting it before Judge Gettleman), the Court directed Plaintiff to provide any suggested revisions to the settlement agreement

---

agreeing to the settlement amount without her consent and of coercing her into stating her own agreement to the settlement "under duress." (*Id.*). Under these circumstances, the Court determines that Plaintiff waived any privilege with respect to these email communications and therefore considers them herein. *See Todd v. Kohl's Dept. Store*, No. 08-cv-3827, 2010 WL 3720265, at *1 (N.D. Ill. Sept. 15, 2010) ("By making the allegations that he did against his attorney, Mr. Todd clearly waived the attorney-client privilege as to those matters relating to the formation of the alleged settlement agreement.").

proposed by Defendant's counsel (which Plaintiff personally acknowledged receiving) by May 24, 2018; and the Court advised Plaintiff from the bench and in the Order entered afterward that any such revisions "must be consistent with the parties' agreement that was stated on the record" during the April 16 settlement hearing. (Doc. 65). But Plaintiff's response to the instant motion now shows that her objections to the proposed written settlement agreement went to the heart of the terms stated on the record on April 16, specifically: (1) Plaintiff's release of her IDHR claims; (2) Plaintiff's perceived weakening of her worker's compensation claim as a result; (3) the confidentiality provision; (4) the settlement amount; and (5) the percentage of the settlement amount to be paid in satisfaction of Plaintiff's attorneys' fees. (Doc. 102, at 5, 14-15, 27, 34, 46-52).[5]

Perhaps because the Court had instructed Plaintiff that any requested changes to Defendant's proposed written agreement must be consistent with the terms agreed upon during the April 16 settlement hearing (and most if not all of Plaintiff's objections were not), neither Plaintiff nor her counsel provided Defendant with any suggested revisions to that agreement as required by the Court's May 17 Order. (Doc. 82, at 2). A flurry of motions then followed. Plaintiff filed another motion to vacate the parties' Consent to proceed before a magistrate judge (Docs, 62, 67), which Judge Gettleman directed this Court to resolve, and which this Court's August 16 Order granted. (Docs. 70, 115). Plaintiff's counsel then filed motions to withdraw, asserting that "they and the Plaintiff have irreconcilable differences and have a conflict of interest over positions the Plaintiff has taken regarding the settlement of this case" (Docs. 74, 76), which this Court's July 26

---

[5] Regarding this latter issue, Plaintiff's response indicates that on the day of the May 17 court hearing, Plaintiff's counsel offered to lower their fees if Plaintiff resolved her objections to the settlement agreement that day. But Plaintiff failed to do so, and her counsel declined to make this offer again thereafter. (*Id.* at 50).

Order also granted.  (Doc. 101).  And Defendant filed the instant motion to enforce the parties' April 16 oral settlement agreement and for the fees it incurred in bringing the motion.  (Doc. 82).  Plaintiff now opposes this motion by claiming that she never agreed to the settlement amount (rather, her lawyer did); she did not want to give a recorded statement at the April 16 settlement hearing and did so "under duress"; she did not understand at the time that her "statements under duress" were "final"; and she was "shaking [her] head" and "said no several times in court," particularly in opposition to the confidentiality term and the fact that the settlement agreement was binding.  (Doc. 102, at 5, 14-15, 48-52).  The Court now addresses each of these arguments.

## DISCUSSION

"A settlement agreement is a particular kind of contract, and so contract law (here, the law of Illinois) governs."  *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir, 2008); *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) ("Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law").  Additionally, "federal law requires that a settlement of a Title VII suit [as happened here] must be knowing and voluntary."  *Newkirk*, 53 F.3d at 774; *Dillard v. Starcon, Int'l, Inc.*, 483 F.3d 502, 507 and n.4 (7th Cir. 2007) ("the federal law 'knowing and voluntary' requirement is a prerequisite to be satisfied after the existence of a binding agreement under state contract principles has been established").  Accordingly, the Court first examines whether the parties' oral agreement recited on the record during the April 16, 2018 settlement hearing meets the requirements for enforceability under Illinois law, and then considers whether Plaintiff's agreement to that settlement was also "knowing and voluntary" as required under federal law.  After resolving these issues, the Court then addresses Defendant's request for sanctions under the Court's inherent power.

10

I.      **Enforceability of the Oral Settlement Agreement Terms Under Illinois Law**

A.      **Governing Illinois Law**

"Oral settlement agreements are enforceable under Illinois law if 'there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement.'" *Dillard*, 483 F.3d at 507 (quoting *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995)). "Whether a 'meeting of the minds' occurred depends on the parties' objective conduct, not their subjective beliefs." *Id.* at 507. "All that is required is "sufficient clarity to ascertain the parties' understanding." *TRT Transp., Inc. v. Aksoy*, 506 Fed App'x 511, 513 (7th Cir. 2013). Thus, an agreement is enforceable when the "essential terms" are sufficiently "definite and certain" that "a court can ascertain the parties' agreement from the stated terms and provisions." *Dillard*, 483 F.3d at 507. Moreover, "the simple fact that a formal document will follow does not reduce an oral agreement to a 'negotiation' if 'the ultimate contract will be substantially based upon the same terms.'" *Tarau v. Coltea*, No. 15-CV-03545, 2017 WL 3521410, at *7 (N.D. Ill. Aug. 16, 2017) (quoting *TRT Transp.*, 506 Fed. App'x at 513).

Illinois law is equally clear in holding that the existence of a valid and enforceable settlement agreement (like any other contract) is a question of law for the Court to decide "when the basic facts are not in dispute." *Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016). As noted above, Plaintiff attempts to manufacture such a dispute here, by claiming that she "said no several times in court" to reject the settlement's confidentiality provision, and that she was "shaking" her head at one point to convey that she did not agree to a "binding" settlement. (Doc. 102 at 5, 14-15; Doc. 107, at 5, 14-15). But Plaintiff gave no verbal or visual indication of any such objection during the April 16 hearing. To the contrary, just as the hearing transcript shows, she unequivocally confirmed that she

heard the settlement terms, had discussed them with her lawyer, they were an accurate summary of her agreement to settle the case, and she understood her oral settlement agreement was binding. (Doc. 82-2, at 10-11). Moreover, this unqualified exchange is corroborated not only by the Court's memory, but also by the audio recording on which that hearing transcript is based. And while Plaintiff futilely attempts to cast doubt on this evidence by claiming that the court microphones failed to pick up all of her and her counsel's statements during the hearing and that the hearing transcript is therefore inaccurate (Doc. 102, at 14-15, 25), this incredible assertion is flatly refuted by the clarity of Plaintiff's announcement during the hearing that she required clarification of the only settlement term that caused her concern – "the tax part of it." (Doc. 82-2, at 11). Thus, since the basic objective facts here are beyond any rational dispute, the enforceability of the parties' oral settlement agreement is a question of law to which the Court now turns.

### B. The Enforceability of the Settlement Terms Asserted by Defendant

As discussed above, Defendant seeks to enforce the following 15 terms recited during the April 16 settlement conference hearing:

1. Defendant will pay Plaintiff the settlement sum specified in the April 16 hearing transcript (Doc. 82-2, at 3);

2. 60% of the settlement sum will be distributed to Plaintiff personally, and 40% will be distributed to satisfy Plaintiff's attorney's fees (*id.*);

3. Of the settlement proceeds to be distributed to Plaintiff personally, a federal form 1099 will be issued to Plaintiff for 50% of the settlement sum, and a W-2 form will be issued for the remaining 50% of the settlement sum, and this latter portion will thus be subject to wage withholding (*id.*);

4. Once Defendant tenders the settlement sum as recited above, it will have satisfied the monetary portion of the settlement agreement, and thus, the settlement agreement is not contingent on an agreement being reached by Plaintiff and her then current and former counsel regarding the division of the attorneys' fees among counsel (*id.* at 7);

5. This case, *Singleton v. Amita Health*, 17-cv-4514 (N.D. Ill.), will be dismissed (*id.* at 5);

6. Defendant will make no admission of liability (*id.*);

7. Defendant will not rehire Plaintiff, and Plaintiff cannot reapply for employment with Defendant (*id.* at 4-5);

8. Plaintiff will release all claims (*id.* at 5);

9. This release is subject to a "carve-out" for a specific worker's compensation claim relating to an injury Plaintiff allegedly suffered, but this carve-out is explicitly limited to the worker's compensation claim for that alleged injury, and the parties explicitly acknowledged that any claims for retaliatory discharge or wrongful termination were not carved out and were instead included in Plaintiff's release (*id.* at 4);

10. Plaintiff will withdraw all administrative charges relating to her employment with Defendant pending in the Illinois Department of Human Rights and any other administrative charges relating to her employment with Defendant; will not revoke such withdrawals; and will tender to Defendant file-stamped copies of the withdrawals of such administrative charges (*id.* at 5, 8);

11. Plaintiff will not file a lawsuit for a claim that she released in this agreement and, in the event she does so (and Defendant has provided consideration for the release), Plaintiff will indemnify Defendant for that action (*id.* at 4);

12. The settlement terms will be kept confidential (*id.* at 9);

13. The foregoing confidentiality provision is subject to the exceptions that Plaintiff will be allowed to "discuss the terms of the settlement with her attorney, her tax advisors, of course, the IRS, and as otherwise required by law" (*id.* at 3);

14. Plaintiff will pay the liquidated damages amount specified in the April 16 hearing transcript, in the event she breaches the confidentiality provision of the settlement agreement (*id.*);

15. "[N]on-disparagement" without any further details. (*id.* at 5).

(Doc. 82, at 4-5, citing Doc. 82-2, at 3-9).

As also discussed above, an oral settlement agreement is enforceable under

Illinois law if there is an offer and acceptance and the terms are sufficiently definite and

certain to allow a court to "ascertain the parties' agreement from the stated terms and provisions." *Dillard*, 483 F.3d at 507. The Court concludes that this standard is met for the first fourteen terms stated above, as it perceives no ambiguity or uncertainty in those terms. Plaintiff does not contend otherwise. Instead, she argues generally that she "did not understand a lot as to what was going on due to being uninformed" (Doc. 102, at 4). But that objection is both too non-specific to challenge these terms, and belied by her admissions during the April 16 hearing that she heard all of the settlement terms, had discussed them with her lawyer, and they were an accurate summary of what she agreed to settle the case. (Doc. 82-2, at 10-11). *See also TRT Transp.*, 506 Fed. App'x at 513-14 (enforcing settlement agreement against party who failed to explain what was "uncertain" about the settlement terms he opposed). Similarly unavailing is Plaintiff's equally generalized objection that she "could not understand the language" in the written settlement agreement that Defendant proposed (Doc. 102, at 23), since Defendant has not sought enforcement of its proposed written agreement. (Doc. 82).

Nor is the enforceability of these settlement terms impeded by the lack of a confirming written settlement agreement. While the parties here planned to memorialize their settlement in a signed agreement (defense counsel said she and opposing counsel had agreed on some language for the confidentiality provision and the covenant not to sue that would be sent to Mr. Dvorak after the hearing), these terms were nevertheless stated with sufficient specificity during the April 16 hearing. (Doc. 82-2, at 3-5). For instance, the parties made clear during the hearing that their confidentiality obligation applied only to the settlement terms; that Plaintiff was nevertheless allowed to make disclosures to her attorney, tax advisors, the IRS, and as otherwise required by law or if

issued a subpoena; and that Plaintiff would be subject to liquidated damages for a specified dollar amount stated in the transcript if she breached the confidentiality provision. (*Id.*). Based on this record, the Court recommends enforcing a mutual confidentiality provision such that both sides must keep the settlement terms confidential. As a practical matter, however, this Report and Recommendation in the public court record reveals all the settlement terms except the specific monetary amounts to which the parties agreed.[6]

Similarly, there is reason to enforce the covenant not to sue since the parties made clear during the April 16 hearing that this applied only to the claims Plaintiff released (all claims, except a worker's compensation claim limited to the injury she allegedly sustained

---

[6]      Decisions in this Circuit consistently hold that a settlement agreement that is the subject of a motion to enforce must be made public even when the agreement contains an enforceable confidentiality provision, given Seventh Circuit authority recognizing the public's interest in understanding "why a case was brought (and fought) and what exactly was at stake in it and was the outcome proper." *E.g.*, *Baer v. Wabash Ctr., Inc.*, No. 4:15-CV-00094, 2016 WL 6080940, at *3 (N.D. Ind. Oct. 18, 2016) (quoting *GEA Group AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014)). But these decisions also recognize that a court may nevertheless "permit the sealing of documents if there is good cause to do so—that is, if the movant's privacy interests trump the interest of the public in full transparency of the judiciary." *Id.* at *3. Indeed, the Seventh Circuit has allowed the sealing of confidential documents concerning the settlement of an employee's Title VII and other claims in an appeal challenging the enforcement of that settlement. *Carlson v. CSX Transp., Inc.*, 710 Fed. App'x 700, 702 (7th Cir. 2017) ("The initial and final settlement agreements between Carlson and CSX are confidential and have been filed under seal, so we discuss specific provisions only to the extent publicly disclosed."). And various district courts have similarly allowed confidential settlement terms to be redacted, even when the settlement is the subject of a motion to enforce. *E.g.*, *White v. Lowe's Home Ctrs., Inc.*, No. 12-CV-1, 2012 WL 5497867, at *1 n.1 (N.D. Ind. July 19, 2012) (redacting settlement amount throughout report and recommendation on motion to enforce), *adopted by*, 2012 WL 5497853, at *1 n.1 (N.D. Ind. Nov. 13, 2012) ("While Defendant's motion was filed under seal to maintain the confidences of the settlement agreement, this Order is not sealed because any confidential terms of the agreement have been redacted."). Here, given the need to determine and explain which of the settlement terms asserted by Defendant are sufficiently definite to enforce, it is necessary to disclose those terms, but unnecessary to include the specific monetary amounts of the settlement sum and liquidated damages provision. Accordingly, as in *White v. Lowes*, the Court concludes that there is sufficient interest in the confidentiality of those figures and no sufficient competing need to disclose them, and therefore omits mention of those figures in this Report. *Id.*

in November 2016). (*Id.*). And the parties explicitly agreed that each of their settlement terms was binding regardless of whether it was later confirmed in writing. (*Id.* at 9-11). This is all that is required for the enforcement of oral settlement terms that are so definite and certain. *TRT Transp.*, 506 Fed. App'x at 513 ("immediately after the lawyer mentioned the anticipated written agreement, the magistrate judge sought and received verbal confirmation, directly from Aksoy and an officer of TRT Transportation, that '[t]hese terms are enforceable.' Thus, the district court did not abuse its discretion in finding that the parties intended to be bound by the oral agreement.").

The Court therefore concludes that the parties evidenced "an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement" during the April 16 hearing, and that the first 14 settlement terms recited above are sufficiently "definite and certain" to warrant enforcement under Illinois law. *Dillard*, 483 F.3d at 507. But the Court reaches a different conclusion regarding the final fifteenth term that Defendant seeks to enforce – non-disparagement. As noted, the description of this term during the hearing consisted of a mere 4 words stated by defense counsel: "and I believe non-disparagement." (Doc. 82-2, at 5). There was no further discussion of the provision after this. In this Court's view, this term as described on the record is far too general to discern the parties' intent regarding its scope and content. In addition to being equivocal on its face, this statement fails to specify whether there were carve-outs for testimony required by subpoena and other judicial statements (as Defendant's proposed agreement indicates). (Doc. 82-1, at 10). The Court therefore recommends that Defendant's motion be denied only insofar as it seeks enforcement of a "Non-disparagement clause." (Doc. 82, at 5). But that conclusion does nothing to undermine the clear enforceability of the

16

remaining 14 settlement terms recited above.  Given that defense counsel's reference during the hearing to a non-disparagement provision was so tentative and cursory ("and I believe non-disparagement" (Doc. 82-2, at 5)), the failure to finalize that term during the hearing or in a subsequent written agreement poses no barrier to enforcement of the remaining settlement terms, all of which were definite and clear.[7]

## II.     Plaintiff's Defenses to Enforcement of the Oral Settlement Agreement

Where (as here) the settlement sought to be enforced resolves a Title VII claim, once the court determines that the state law requirements for enforceability have been met, it must next determine whether the federal "knowing and voluntary" requirement has also been satisfied.  *Dillard*, 483 F.3d at 507.  Accordingly, having concluded that the foregoing settlement terms are enforceable under Illinois law, the Court now considers whether the parties' oral settlement agreement was also knowing and voluntary.

### A.     Governing Federal Law

"Whether a Title VII settlement is knowing and voluntary is a question of federal law" determined under "the totality of the circumstances."  *Baptist v. City of Kankakee*, 481 F.3d 485, 490-91 (7th Cir. 2007).  Where a plaintiff is represented by her chosen counsel throughout negotiations and settlement, the resulting settlement agreement "is

---

[7]     This ruling also addresses Plaintiff's repeated objection to any sort of "gag order" that might encumber her ability to pursue her reserved worker's compensation claim.  During the April 16 settlement hearing and a later hearing on July 26, 2018, both Defendant and the Court made clear to Plaintiff that neither the settlement of this case nor its confidentiality provision will impede her ability to pursue that claim in the agency involved, or prevent her from discussing it with any new attorneys. Yet Plaintiff continues to complain that its "gag order" will cause such an obstacle. (Docs. 102 and 107, at 25-26).  Non-enforcement of the parties' contemplated non-disparagement provision should alleviate any such concern.  And again, while the Court recommends that the parties' confidentiality provision be enforced, the only remaining confidential terms are the settlement sum and liquidated damages amount, and Plaintiff retains the right to disclose even those terms if required in a legal proceeding.  (Doc. 82-2, at 3-4).  ***But Plaintiff is nevertheless cautioned that such rulings in no way condone disparagement or defamation.***

presumptively informed and willing, absent circumstances such as fraud or duress." *Id.* (quoting *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989)). But where such extenuating circumstances are shown, the Court may not presume that the settlement was knowing and voluntary and must move on to determine that issue under the totality of the circumstances. *Id.*

The threshold issue of duress is again decided under Illinois law. *Montgomery v. Village of Posen*, 711 Fed. App'x 343, 345 (7th Cir. 2018); *Castellano v. Wal-Mart Stores, Inc.*, 373 F.3d at 817, 820 (7th Cir. 2004). "Under that law duress is measured objectively; it occurs when 'one is induced by a wrongful act or threat of another to make a contract under circumstances that deprive one of the exercise of free will.'" *Montgomery*, 711 Fed. App'x at 345 (quoting *Rissman v. Rissman*, 213 F.3d 381, 386 (7th Cir. 2000); *Allen v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 285 Ill. App. 3d 1031, 1036, 675 N.E.2d 187, 191 (1996)). Accordingly, "Illinois law is clear that duress 'does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances." *Castellano*, 373 F.3d at 820 (quoting *Cont'l Ill. Nat'l Bank and Tr. Co. v. Stanley*, 606 F. Supp. 558, 562 (N.D. Ill. 1985)). Rather, the party who obtained the advantage under the agreement must be "shown to have acted with some degree of fraud or wrongdoing." *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash., Inc.*, No. 94 C 7734, 1996 WL 115976, at *3 (N.D. Ill. Mar. 13, 1996).

Here Plaintiff opposes the motion to enforce the oral agreement recited during the April 16 hearing on the grounds that her acceptance of it was neither knowing nor voluntary, and was instead the product of undue influence and duress by her attorneys and by Defendant. (Docs. 102 and 107). In other words, although Plaintiff was

18

represented by her chosen counsel throughout the settlement proceedings (*i.e.*, the exchange of written settlement positions, the settlement conference and caucuses, and the settlement hearing), she attempts to avoid the presumption that her settlement was knowing and voluntary that usually results from such representation by alleging that she accepted the settlement under duress and undue influence by those attorneys and by Defendant. But Seventh Circuit authority requires more than mere allegations of duress, undue influence, or other extenuating circumstances to avoid the presumption that a settlement was knowing and voluntary; Plaintiff must point to "specific evidence" supporting such allegations to trigger a "totality of the circumstances" analysis.[8]

For the reasons explained below, this Court concludes that Plaintiff has failed to substantiate her claims of duress and undue influence, thereby allowing the Court to presume that Plaintiff's settlement was knowing and voluntary without considering the surrounding circumstances. *Newkirk*, 536 F.3d at 774 ("in the absence of a showing of fraud, duress, or other circumstances suggesting that the settlement was not knowing or voluntary, the district court need not examine the circumstances surrounding the settlement"). Nevertheless, for the benefit of any review of this Report by the District Judge or on appeal, the Court also undertakes that additional analysis and further concludes that Plaintiff's agreement to the settlement in this case was knowing and voluntary, even when taking all of the circumstances she now alleges into account.[9]

---

[8]     *Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009) ("For us to reach this issue, however, the party challenging the release 'must come forward with specific evidence sufficient to raise a question as to the validity of the release.'" (quoting *Pierce v. Atchison Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 438 (7th Cir. 1997)); *Sklaney v. Wilbert Funeral Servs., Inc.*, No. 10 CV 5917, 2011 WL 2461860, at *5 (N.D. Ill. June 17, 2011) (same); *Baker v. Potter*, No. 02 C 525, 2005 WL 843169, at *14 (N.D. Ill. Jan. 20, 2005) (same).

[9]     The Court is mindful that duress allegations are often "highly fact-contingent," and

**B.** **Plaintiff Has Failed to Substantiate Her Claims of Duress and Undue Influence**

Plaintiff's duress claim is two-pronged, and somewhat inconsistent. On the one hand, Plaintiff claims she "was left in the dark and misinformed and uninformed by [her] attorneys" about the negative ramifications of her settlement, leaving her "placed in an unfair agreement with Amita Health that will cause a huge financial hardship." (Doc. 102, at 9). On the other hand, Plaintiff claims she told her lawyers before the settlement conference that she would not accept any offer lower than her EEOC mediation demand two years earlier, and that the timing of the settlement on the terms Amita was proposing would cause her "financial hardship," but she "was pressured into this agreement" by her attorneys. (*Id.* at 16, 27). In other words, Plaintiff claims both that she did not understand how bad the deal was because her lawyers did not tell her, and that she told her lawyers how bad the deal was before the April 16 conference, but they pressured her to take it. Putting aside the inconsistency, neither claim constitutes duress, undue influence, or any other reason to set aside the settlement that Plaintiff accepted on April 16.

**1.** **Plaintiff's Allegations Against Her Counsel**

Plaintiff's allegations against her counsel are wide ranging: she claims they left her "in the dark and misinformed;" they did not have her "best interest at heart" and instead strove to "please Amita health," even "colluding with Amita Health"; and "[t]he

---

therefore may sometimes require an evidentiary hearing when those facts are disputed. *Israel v. Israel*, No. 13 C 5271, 2014 WL 6685517, at *10 (N.D. Ill. Nov. 25, 2014). But as shown below, while Defendant and Plaintiff's former counsel most certainly dispute Plaintiff's duress allegations, any such dispute is irrelevant because those allegations fail as a matter of law. *See Baptist v. City of Kankakee*, 481 F.3d at 490-92. And since the question of whether a settlement was knowing and voluntary is similarly a question of law, *id.* at 490-91, no evidentiary hearing is required in this case on either issue. *Israel*, 2014 WL, at *10 ("Illinois courts have 'frequently held that a claim of duress may be disposed of without an evidentiary hearing.'" (quoting *Krilich v. Am. Nat'l Bank & Tr. Co. of Chi.*, 334 Ill. App. 3d 563, 573, 778 N.E.2d 1153, 1163 (2nd Dist. 2002)).

entire representation was a sham as well as the settlement agreement." (Doc. 102, at 9, 24, 29, 40). But far from colluding with Defendant, Plaintiff's counsel (only the last of several lawyers whose representation of Plaintiff ended in withdrawal) thoroughly advanced her arguments in the pre-conference settlement correspondence required by the Court and during the settlement conference itself.[10] Moreover, contrary to Plaintiff's contention that "the outcome would have been much different" if she "would have had control" during the settlement conference (Doc. 102, at 27), Plaintiff appeared to be informed and involved throughout the conference. As explained above, this Court had numerous caucus sessions with Plaintiff and her attorneys over approximately three hours during which she actively participated; and her input continued right up to the point that she halted the April 16 hearing during which the parties confirmed their settlement terms "to ask about the tax part of it." (Doc. 82-2, at 12). She then discussed that issue with her counsel and said she had no need to ask the Court any more questions. (*Id.*).

But regardless of whether this Court views Plaintiff's allegations as meritorious, it need not (and does not) make any findings on these issues because "the adequacy or propriety of counsel's advice is irrelevant to the question of whether a settlement was knowing and voluntary." *Baptist v. City of Kankakee*, 481 F.3d at 490-91 (enforcing oral settlement under Illinois law).[11] "Collateral attacks of this nature neither negate the

---

[10]    As noted above, in addition to the two retained lawyers who represented Plaintiff during the April 16 settlement conference, and her previous settlement counsel who also withdrew from the case (Doc. 47), Plaintiff's various filings in this case refer also to three other attorneys who withdrew from her "combined cases" under "similar circumstances." (*See supra* note 2; Doc. 38, at 2).

[11]    *See also White v. Lowe's*, 2012 WL 5497853, at *8 (rejecting claim that plaintiff's attorney "engaged in misconduct, either by failing to adequately explain the terms of the settlement or by

presumption created by representation by counsel nor demonstrate the kind of fraud or duress capable of rebutting that presumption." *Id.* Nor do such allegations suffice to show that Plaintiff did not exercise her own free will when she agreed to the settlement, which is the cornerstone of a duress claim. *See Rissman*, 213 F.3d at 386 ("Illinois defines duress as 'a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will"). That is because belated claims that a party's attorney intimidated, threatened, warned of withdrawal, or even colluded with the party's litigation opponent are insufficient to show that the party did not act willingly and freely when she appeared before a federal judge and agreed on the record to settle her case, as Plaintiff did here. *Allen v. Dana*, No. 1:10-cv-281, 2011 WL 3163232, at * 2-3 (N.D. Ind. July 26, 2011) (plaintiff's argument "that his counsel was incompetent by not preparing him for the conference, failing to provide a list of his damages to the magistrate judge, and 'was in collusion with counsel for the Defendants'" failed to demonstrate "that he agreed to settle against his will"), *aff'd*, 470 Fed. App'x 506, 508 (7th Cir. 2012) (party's claim that his "attorney 'took advantage' of him, even 'threataning [sic] him in a 'back room' before the settlement conference," failed to establish "that he was 'deprived of the free exercise of his own will' when he agreed on the record in federal court to settle his case . . . even a lawyer's warning that he will withdraw from representation if a client does not sign a settlement agreement does not provide the client with a viable duress defense" (citing Indiana decisions)).

---

persuading her to enter into a settlement that she believes was not in her best interests" because "the adequacy or propriety of counsel's advice is irrelevant" (quoting *Baptist v. City of Kankakee*); *Thompson v. Houlihan*, No. 09 C 2914, 2011 WL 833604, at *7 (N.D. Ill. Mar. 4, 2011) (rejecting claim that plaintiff's attorney "intimidated him and failed to explain" the settlement document: "the adequacy or propriety of counsel's advice is irrelevant," quoting other Seventh Circuit decisions).

Plaintiff's allegations against her counsel thus fail to substantiate duress because they are both irrelevant and inadequate as a matter of law. But also, they are directed at the wrong party. Seventh Circuit case law is equally clear in holding that "a claim of fraud or duress sufficient to invalidate an agreement would have to be brought against an opposing party or a fellow party to a contract, not against a party's own attorney." *Thompson*, 2011 WL 833604, at *7 (citing *Baptist v. City of Kankakee*, 481 F.3d at 491 n.2 ("Fraud in the inducement is a claim against the opposing party; the plaintiffs have not claimed that *the defendants* fraudulently induced them to enter into the settlement agreement. Duress, too, is a claim against the other party to the contract.")). And as shown below, Plaintiff's allegations against Defendant similarly fail to constitute duress.

### 2.    Plaintiff's Allegations of Financial Hardship

The second ground for Plaintiff's duress claim is based on the alleged unfairness of the settlement, which she contends will cause her a "huge financial hardship" because it required the release of her IDHR claims. (Doc. 102, at 9, 15-17). Plaintiff maintains that releasing those claims in turn rendered the worker's compensation claim that she reserved under the settlement "useless," since the IDHR disability charge that she released was purportedly "the strongest part" of her worker's compensation claim. (*Id.* at 15-17, 46).[12] Plaintiff also complains that Defendant impaired her ability to pursue her

---

[12]    As noted above, Plaintiff filed EEOC charges on March 30, October 7, and December 9, 2016. (Doc. 1, at 8-10). After the EEOC issued right to sue letters and closed the cases (*id.* at 11-12), Plaintiff apparently sought review in the IDHR, and those proceedings were pending as of the settlement conference, although Plaintiff claims the IDHR had stayed its investigations due to this federal lawsuit. (Doc. 102, at 16; Doc. 82-1, at 1-2). Plaintiff also filed another charge with the IDHR on September 12, 2017, asserting "disability" and "gender identity" discrimination and retaliation. (Doc. 37, at 9). Although that charge was not stayed, Plaintiff complains that Defendant delayed that proceeding as well. (Doc. 102, at 16-17). And although Plaintiff plainly agreed during the April 16 hearing to withdraw all her IDHR charges as part of her settlement of this case (Doc. 82-2, at 5-8), she now regrets having done so, especially this latter "disability

IDHR claims before the settlement by "strategically stalling" the federal case to run down the statute of limitations on those charges and canceling the factfinding conference in Plaintiff's IDHR proceedings under the guise of seeking to settle the federal case. (*Id.* at 16-17). This, Plaintiff argues, eventually caused the statute of limitations to run on her various IDHR and state claims, leaving Plaintiff no forum in which to pursue those claims if the instant case is dismissed (not that Plaintiff could do so, since she released those claims as part of her settlement). (*Id.*). And finally, Plaintiff alleges that Defendant added to her "severe financial distress" by overstating "to the federal government" the amount and duration of her 2016 income (as contrasted with what was reported on her 2016 W-2 form), causing her to lose unspecified government benefits and become subject to an overpayment charge. (*Id.*).

According to Plaintiff, the combination of these events "all happening at the same time" has caused her a "catastrophic benefit offset," which she describes as follows: "If I was to receive a settlement payment from Amita I would not have anything to show for it, because I would have to pay it back in the overpayments due to an offset. If I was to receive any worker comp benefits I would have to pay it back to Unemployment due to an offset as well. . . . Again, the timing of it all was well planned to cause this financial hardship to happen to me." (*Id.* at 21-22). But there are several problems with these arguments, and their timing is chief among them. Contrary to Plaintiff's assertion that Defendant prolonged this litigation, the record shows that both sides agreed to a settlement conference on March 1, 2018, but it was Plaintiff who requested that date to

---

charge," which Plaintiff insists had value on its own and when combined with her worker's compensation claim. (Doc. 102. at 16-18, 20).

be extended while she searched for new counsel. (Docs. 32, 48-50). Moreover, Plaintiff fails to explain why any delay by Defendant prevented her from pursuing her rights before applicable statutes of limitation ran, or what impact those limitations deadlines had on her decisions at the April 16 settlement conference.[13]

To the contrary, Plaintiff states that the statutes of limitations to investigate at least some of her IDHR charges and to sue in state court did not run until months after the settlement conference, and that she was aware of those deadlines before the settlement conference and even warned her attorneys about them. (Doc. 102, at 16-18). So, Plaintiff knew going into the settlement conference that she had the option to continue to litigate here, in the IDHR, and/or in state court – indeed, she claims she wanted to do just that – but she chose not to. (*Id.* at 17: "I was against canceling the fact finding conference [in the IDHR] as I was on the fence with attending the federal settlement conference altogether, because I felt that it would not go well based on the settlement demand letter from the defendants"; *id.* at 27: "I felt the settlement wouldn't go well at this time, upon receiving the settlement demand letter. I was ready to move towards discovery."). That available alternative, which Plaintiff knowingly declined, debunks any claim of duress as a matter of law. *Baptist v. City of Kankakee*, 481 F.3d at 485 ("a party asserting duress cannot prevail if he had an alternative to entering into the agreement").

The record thus refutes Plaintiff's contention that Defendant impaired her ability to pursue her IDHR claims before the settlement; rather, the record shows that Plaintiff

---

[13]     Solely for purposes of considering Plaintiff's opposition to the instant motion to enforce, the Court accepts Plaintiff's assertions regarding whether and when the limitations periods on her various IDHR charges expired. But as explained below, even if correct, those assertions provide no basis to void her settlement agreement.

opted to release those claims in exchange for a specified sum and now regrets that choice. And even assuming that Defendant did attempt to improve its settlement position by running out the clock on Plaintiff's IDHR claims, it "has long been held that where consent to an agreement is secured merely because of hard bargaining positions or financial pressures, economic duress does not exist." *Israel*, 2014 WL 6685517, at *8 (quoting "*Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 91-92, 707 N.E.2d 609, 614 (1st Dist. 1999)); *Baptist v. City of Kankakee*, 481 F.3d at 491 n.2 (duress requires more than the "the stress of a difficult bargaining position, or financial pressure"). "Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress." *Israel*, 2014 WL 6685517, at *8.

Plaintiff has alleged no such fraud or wrongdoing by Defendant. Nor is this conclusion altered by Plaintiff's unsupported allegation that Defendant caused her to lose various government benefits by overstating her 2016 income. (Doc. 102, at 16). If Defendant did so, Plaintiff may challenge that report with the agency involved. And in any event, Plaintiff may not set aside the settlement merely because she now considers it inadequate to offset financial pressures that are only now apparent to her. *See Baptist v. City of Kankakee*, 481 F.3d at 492 ("A party to a settlement cannot avoid the agreement merely because he subsequently believes the agreement is insufficient." (brackets omitted, quoting *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 863 (7th Cir. 1986))).[14]

---

[14]    While Plaintiff's financial pressures may have increased since the April 16 settlement conference, her difficulty obtaining government benefits was a factor she had every opportunity to consider when she settled the case. As Plaintiff explains, she has been seeking government benefits since 2017, applied for unemployment benefits in March 2018, and that application was denied in April 2018 shortly before the settlement conference. (Doc. 102, at 22). It was only a month after the settlement conference when Plaintiff was informed that her benefit request was

### C.     Plaintiff's Agreement to the Settlement was Knowing and Voluntary Under the Totality of The Circumstances

As shown above, Plaintiff's allegations of duress against Defendant and her own attorneys fail as a matter of law.  And since Plaintiff was represented by counsel during the settlement proceedings in this case, the Court may presume that her settlement was knowing and voluntary.  But no such presumption is necessary, because full consideration of the "totality of the circumstances" similarly compels the conclusion that Plaintiff's oral settlement agreement during the April 16 hearing was both knowing and voluntary.  The Seventh Circuit requires eight factors to be considered to make this determination:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the agreement; (5) whether the employee actually read the release before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part."

*Baptist v. City of Kankakee*, 481 F.3d at 491 n.3.

Regarding the sixth and eighth factors, the Court has already determined that Plaintiff was represented by counsel and was not induced by improper conduct on Defendant's part.  These factors therefore support a finding that Plaintiff's settlement was knowing and voluntary.  As for the remaining factors, while the Court has little information

---

approved, only to learn a month later that her benefits were terminated and she was liable for an overpayment.  (*Id.*).  But Plaintiff's settlement agreement cannot be held hostage to the success or failure of her claims for government benefits.  If any loss of benefits was due to Defendant's erroneous reporting of Plaintiff's income, Plaintiff has recourse in the agencies involved.  And while Plaintiff attempts to cast doubt on the fairness of that process by alleging (once again without support) that the government agent responsible for the denial of her benefits "has several relatives, and friends that work at Amita Health" (*id.*), Plaintiff must seek to redress that alleged conflict in the responsible agency as well.

regarding Plaintiff's education and business experience, it was able to observe her active participation in multiple caucus sessions during the settlement conference. Plaintiff also demonstrated her meaningful input into the process during the hearing afterward when she independently voiced a question regarding the tax ramifications of the settlement she was accepting. Plaintiff's successful pro se motion to vacate the consent to the jurisdiction of a magistrate judge in this case, and her extensive submissions in opposition to the instant motion to enforce, also convince the Court that Plaintiff was more than able to assert herself during the settlement conference and insist that her viewpoint be heard and her instructions followed.

The clarity of the oral agreement – just 14 straightforward terms – also convinces the Court that Plaintiff's agreement to the terms was knowing and voluntary, particularly in light of her demonstrated ability to clarify a term about which she had any question. And while Plaintiff now complains that she had insufficient time to consider the agreement and was not allowed to speak to her spouse before accepting it on the record before the Court (Doc. 102, at 4), such belated objections are plainly insufficient where (as here) the objecting party unambiguously stated on the record at the time of the settlement that she understood and agreed to the settlement terms. *See Allen*, 2011 WL 3163232, at *2 ("even if his attorney did not allow his family members into the settlement conference . . . Allen was asked if he wanted to settle under certain terms, and he said 'Yes.'"), *aff'd*, 470 Fed. App'x at *2. After all, being unable to speak with her spouse did not prevent Plaintiff from asking her tax question during the hearing. And Plaintiff can hardly complain that she was rushed into a decision, when she knew from past experience (a failed EEOC mediation in 2016) that she was free to reject any settlement that she deemed insufficient.

28

*See Montgomery*, 711 Fed. App'x at 345 (affirming enforcement of settlement against party who "knew from the earlier, failed round of settlement talks that he was free to end the talks at any time for any reason, including . . . inadequate time to consider the terms").

Plaintiff's contention that she never agreed to a "binding" oral settlement during the April 16 hearing fails for similar reasons. As noted above, although Plaintiff unequivocally admitted on the record during that hearing that she understood her settlement agreement was binding even in the absence of signed documents (Doc. 82-2, at 12), Plaintiff now claims she did not understand she was making a binding agreement, and that she was "shaking [her] head" during the hearing to indicate her opposition to any binding agreement as soon as she heard that word. (Doc. 102, at 5). Again, the Court has no trouble rejecting these claims because Plaintiff indicated no such objection during the hearing (verbally or physically); she simply confirmed that she understood her oral settlement was binding, and that she could not change her mind on the settlement terms after leaving the courtroom even though no settlement documents were signed, just as the transcript shows. (Doc. 82-2, at 12). But in addition to the transcript – which Plaintiff conveniently claims is inaccurate (Doc. 102, at 15) – the emails submitted with her response to the instant motion similarly confirm that Plaintiff agreed to the settlement terms on the record because "the settlement would be called off" otherwise. (*Id.* at 51). In other words, Plaintiff was not forced to agree to the settlement terms on the record; nor was she laboring under the misimpression that those terms were merely placeholders to be substituted with better ones later. Rather, she agreed to the settlement terms on the record because she did not want to lose them. That is the essence of a knowing and voluntary agreement.

29

This leaves only the seventh factor to be considered – the consideration given in exchange for the release. Plaintiff complains that the settlement amount that Defendant is required to pay is too low because it was less than her EEOC mediation demand two years earlier (*id.* at 27), and that the attorneys' fees to be deducted from the settlement amount are too high because the lawyers who represented Plaintiff at the settlement conference have now withdrawn and will not have to share the fees with Plaintiff's prior attorney. (*Id.* at 37). Neither objection is sufficient to set aside the settlement. Contrary to Plaintiff's contention, the record indicates that her prior attorney has claimed a portion of the fees to be paid by Defendant. (Doc. 95). But in any event, "[a]s long as the person receives something of value in exchange for her own promise or detriment, the courts will not inquire into the adequacy of the consideration." *Baptist v. City of Kankakee*, 481 F.3d at 491-92. Thus, even if Defendant were required to pay *only* fees or costs, with *no* compensation to Plaintiff for any past discrimination, the release of her claims would still be valid. *Id.* (affirming enforcement of settlement where defendant paid plaintiff's attorney's fees, but nothing for past discrimination) (citing *Riley*, 881 F.2d at 375 (holding that defendant's agreement to refrain from seeking costs against plaintiff was sufficient consideration to enforce plaintiff's release of all claims). Accordingly, the Court recommends that Plaintiff be held to her oral settlement agreement, including the provision that Defendant is required to pay a specified sum, with 60% distributed to Plaintiff and 40% distributed in payment of her attorney's fees.

### III. Defendant's Request for Sanctions Under the Court's Inherent Power

Having resolved Defendant's motion to enforce the April 16, 2018 oral settlement agreement, the Court now turns to its additional request for sanctions to be imposed against Plaintiff pursuant to the Court's inherent power. Defendant argues that Plaintiff

"'willfully abused the judicial process' and otherwise conducted the litigation in 'bad faith'"
when she "steadfastly refused to sign the written settlement agreement Defendant
proposed, or propose any modifications to the written settlement agreement, thereby
prolonging this litigation." (Doc. 82, at 9-10). For this, Defendant seeks an award of fees
and costs incurred in bringing the instant motion or, alternatively, dismissal of the action
with prejudice pursuant to Fed. R. Civ. P. 41(b). (*Id.*). But Defendant's request for a
sanction in the form of dismissal would be mooted by enforcement of the parties'
settlement agreement (which this Court recommends), since it explicitly called for such
dismissal.[15] All that remains, then, is Defendant's request for its fees and costs in bringing
the instant motion, which the Court recommends be denied as well.

When considering whether Plaintiff should be sanctioned for refusing to sign the
written settlement agreement that Defendant proposed, it bears repeating that
Defendant's current motion does not seek to enforce that agreement; rather, it seeks to
enforce the parties' April 16 oral settlement agreement. (Doc. 82, at 1). And while the
Court has not done a line-by-line comparison between Defendant's proposed written
agreement (Doc. 82-1) and the terms recited during the April 16 hearing, several
differences are readily apparent. For instance, the proposed written agreement included
provisions that went well beyond maintaining confidentiality of the settlement terms.[16]

---

[15]    Although the parties initially considered dismissal without prejudice with a reservation of
jurisdiction to resolve any attorney lien issues (Doc. 82-2, at 6-7), given that no lien issues remain
(Doc. 95), and in view of Plaintiff's enforceable release and covenant not to sue, the Court
recommends that this action be dismissed with prejudice pursuant to the parties' oral settlement
agreement, rather than as a sanction.

[16]    To name a few, the written agreement provided that: (1) Plaintiff may not disclose the
"contents" of the agreement, or the agreement itself, or even "in any way make reference to" it;
(2) Plaintiff "shall not file this Agreement in any court, shall not produce this Agreement to any
government agency, and shall not introduce into evidence or produce it in discovery in any action
for any purpose whatsoever by anyone, other than in an action between the parties hereto"; and

Similarly, as discussed above, while Defendant's counsel made the cursory statement "and I believe non-disparagement" during the April 16 hearing, Defendant's proposed agreement purported to impose a one-way non-disparagement obligation on Plaintiff (*id.* at 10), even while Plaintiff complains of Defendant's continuing disparagement of her. (Doc. 102, at 17, 28).

The Court can only assume that Defendant did not seek to enforce its proposed written agreement because these terms (and potentially others) deviated from the parties' oral settlement agreement. But in any event, it goes without saying that Plaintiff should not be sanctioned for refusing to sign an agreement that contained such nonconforming terms. And while Defendant claims that Plaintiff refused to propose modifications to Defendant's proposed agreement as required by the Court's May 17 Order (Doc. 82, at 2), Plaintiff insists that she authorized her counsel to send certain proposed revisions to Defendant's counsel ("even though it did not amount to any substantial change or real protection" for her), but her lawyer failed to send them. (Doc. 102, at 24-25). The Court must also consider the conflict that arose between Plaintiff and her counsel at this time (following her accusations against them), as evidenced by their withdrawal shortly afterward. (*Id.* at 22). Effectively without a lawyer, Plaintiff was ill-equipped to parse the language in Defendant's proposed agreement, much less make the numerous revisions necessary to reflect only the terms stated during the April 16 hearing. For these reasons, the Court declines to recommend that sanctions be imposed on Plaintiff.

---

(3) if "required to disclose information regarding this settlement in order to comply with applicable laws and regulations, such disclosure shall be limited only to those who have the lawful right to such information" after extracting a confidentiality agreement and providing written notice to AMITA Health. (Doc. 82-1, at 7-8).

**CONCLUSION**

For the reasons stated above, this Court recommends that Defendant Amita Health's Motion to Enforce the Terms of the Oral Settlement Agreement and Motion for Attorney's Fees or Dismissal with Prejudice (Doc. 82) be granted in part and denied in part as follows: the Court recommends that Defendant's request to enforce the parties' oral settlement agreement be granted as to terms 1-14 set out at pages 12-13 above, and that the case be dismissed with prejudice (though not as a sanction), but that Defendant's request for attorney's fees and other sanctions be denied. Pursuant to Fed. R. Civ. P. 72(b), specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this Order is served. Failure to file objections with the Honorable Robert W. Gettleman within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation.

ENTER:

Dated: September 25, 2018

SHEILA FINNEGAN
United States Magistrate Judge

33